## WINGATE v. NEIDLINGER.

PRACTICE.—*Supreme Court.*—Where there is evidence in the record which sustains the verdict, the Supreme Court will not disturb it, though the evidence may preponderate in favor of the party against whom the verdict is rendered.

PAYMENT.—*Counterfeit Currency.*—A payment in counterfeit notes which pass as currency amounts in law to no payment, and does not satisfy the debt, when the person receiving such payment has not forfeited his right to have recourse by his delay and negligence.

SAME.—*Offer to Return Counterfeit Currency.*—*Diligence.*—A person who receives currency in payment from one who makes the payment in good faith is required to use diligence to ascertain whether it is genuine, and, if it is discovered to be forged, to return it within a reasonable time after such discovery, or, if it cannot be returned, to give notice of its character.

From the Putnam Circuit Court.

*D. E. Williamson, A. Daggy,* and *G. A. Knight,* for appellant.

*W. W. Carter* and *S. D. Coffey,* for appellee.

BUSKIRK, J.—This action was commenced by the appellee against the appellant in the Clay Circuit Court, and was, on motion of appellant, venued to the Putnam Circuit Court, where it was tried by a jury, and resulted in a verdict against

appellant for fifty dollars, on which the court below rendered judgment, over a motion for a new trial.

The complaint is in three paragraphs.

The first is a common count for personal property, sold and delivered, etc.

The second is upon a settlement of accounts for an ascertained balance due from defendant to plaintiff.

The third paragraph sets up specifically the facts, in which it is alleged that the defendant was indebted to the plaintiff in the sum of fifty dollars for personal property, etc., and that in discharge of said indebtedness said defendant paid said plaintiff a fifty-dollar counterfeit United States treasury note, and that plaintiff received the same in the belief that said note was genuine, and upon discovering that it was a counterfeit, he tendered it back to defendant, and demanded payment to said amount in genuine bills.

The defendant answered this complaint in two paragraphs. 1. Denial. 2. Payment.

To which second paragraph of answer the plaintiff replied by general denial, which put the cause at issue.

The trial, as above stated, resulted in a verdict for fifty dollars for plaintiff.

The defendant (appellant here) filed his motion and reasons for a new trial, which motion the court overruled, and the defendant excepted, and thereupon the court rendered judgment for the amount against the defendant.

The reasons for a new trial, as assigned, are as follows:

1. The verdict of the jury is contrary to the evidence.

2. The verdict of the jury is contrary to law and the evidence in the case.

3. The verdict is contrary to the evidence, and against the law of the case as given by the court.

The evidence is in the record, and was all directed to the third paragraph of the complaint.   There is a direct conflict in the evidence upon the point whether the appellee received the bill in question from the appellant; and while the evidence may preponderate in favor of the appellant, there is evidence

in the record which sustains the verdict, and under the settled rule of practice in this court, we cannot disturb the verdict upon the evidence.

The appellant purchased of the appellee one hundred dollars' worth of clover seed, and paid for the same either in legal tender treasury notes or national bank notes, or in some of both kinds of currency. The transaction took place on the 26th day of February, 1873. The appellee took the money home with him, and in the latter part of August of that year he returned to the appellant a fifty-dollar legal tender treasury note, which he claimed he had received from him in payment for the clover seed. During this time, the appellee made no attempt to ascertain whether the money he had received was genuine. He presented the bill, shortly before he tendered it back, to a bank in Terre Haute, where it was pronounced to be a counterfeit. It was admitted upon the trial to be a base counterfeit. It is not pretended that the appellant passed the bill with knowledge of its character. The parties stand equally innocent. It is well and firmly settled that a payment in forged bills of third persons, or in counterfeit notes which pass as currency, amounts to no payment in law, and cannot be regarded as a satisfaction of the debt, where the person receiving them has not, by his delay and negligence, forfeited his right to have recourse upon the person from whom he received them. In the present case, the appellee kept the note in question over six months without using any diligence or making any effort to ascertain its genuineness, and it is earnestly contended by counsel for appellant that the appellee, by such delay and want of diligence, has elected to regard the payment as valid, and has forfeited his right to recover from the appellant.

The question presented for decision is one of great practical importance, and has received careful and mature consideration. The real question is, whether a person who receives currency in payment is required to use diligence to ascertain whether it is genuine, and, if it is discovered to be forged, to return it within a reasonable time after such discovery, or if it cannot be returned, to give notice of its character.

In the recent case of *Atwood* v. *Cornwall*, 13 Amer. Law Reg., N. S. 230, the question is very fully considered by the Supreme Court of Michigan, from which we make an extended quotation. The court say :

"A more important question, however, arises concerning the relative duties and liabilities of parties who honestly receive and pay out counterfeit money. The general current of authority appears to sustain the position that a person passing negotiable paper warrants its genuineness to such an extent that he is bound to make it good if found bad, and returned within a proper time. But where paper is genuine but worthless, although not supposed to be so by either party, the authorities are in conflict as to such liability and its extent. The decisions applied to bank-notes have all gone upon the analogy of ordinary negotiable securities. There is no modern decision which we have been able to find, which draws any line in dealing with payments in counterfeits or refers specially to that coin or paper which the law deals with as money—receivable not by currency merely, and by consent, but by statute and by obligation.

" The decisions, in giving reasons for their results, were originally based on the doctrine that payments by negotiable paper were in a measure conditional, and not absolute in all cases, but dependent on the possibility of getting payment by diligence. And the distinction between counterfeit and otherwise valueless paper has not always been kept up, nor always well defined. See authorities in Story Con., sec. 411 ; Edwards Bills, 205, 206, 207, and notes.

" The decisions, however, agree generally that a party who would otherwise be able to recover back the amount of bad money passed upon him, will be debarred of his action by lack of diligence. And it is much to be regretted that upon the whole subject there are more *dicta* than decisions. It is necessary, in order to discover the real difficulties of the matter, to consider how the doctrines bear practically on the business of the community. The paper which is in controversy is for all legal purposes of currency on a similar footing with coin ; that

is to say, it is a legal tender, and all creditors are compelled to receive it in payment. They do not exercise an option in taking it, as they do in receiving other paper. Inasmuch as they refuse a tender at their peril, the law assumes, and business must be done on the basis, that every business man will become generally familiar with the appearance of the money of the country, so as to be able to exercise a judgment upon it. And while those who are constantly handling money in banks and exchange offices cultivate their faculties more thoroughly in a knowledge of currency, all persons are supposed to have some such knowledge, sufficient to enable them to do business with ordinary security. And it is not to be expected that among ordinary dealers one will have any great advantage over others; while all have means of access, in every community, to some persons who have by their peculiar experience the means of aiding the judgment of those of less experience.

" It is not customary, and cannot be expected, that persons will note down all the bills which they receive, and put ear-marks on them, so that they can recall the persons from whom they are received. Nothing would have a surer tendency to hinder the negotiability of genuine bills than such ear-marks; while the delay and trouble of doing so would be a great hindrance to the dispatch of business. Most currency gets into circulation through the medium of banl, ; and other instrumentalities capable of detecting bad money, and where counterfeit money is circulated, it is usually uttered in such quarters as to render it difficult, if not impossible, to trace it back to its source. The innocent taker of such paper is not generally guilty of any culpable negligence; and between several successive takers it is impossible to hold one any more in fault than the rest, for not detecting the cheat. It is often nothing but a suspicion of forgery that induces a taker to notice from whom he receives a particular bill; and where this suspicion is entertained, and not communicated to the person from whom the paper is received, its concealment may easily operate as a fraud upon him, by preventing him from tracing it back. This

would create a strong moral equity in his favor, whatever the law may determine in regard to it.

"At common law, such authority as we have seems to indicate that, as between two innocent parties, the taker of counterfeit coin cannot claim recourse against him from whom he took it. Shep. Touch. 140; *Wade's Case*, 5 Co. 114. This must have been on the ground already referred to, that parties in equal equity shall not be disturbed. The common law and equity are both full of instances where persons dealing honestly on an equal footing, and with equal means of knowledge, are left where their dealings have placed them, neither having recourse against the other to undo their agreements or transactions. And while in *Markle* v. *Hatfield*, 2 Johns. 455, KENT, C. J., doubts the propriety of the doctrine, the case called for no such doubts, and no decisions were found shaking it.

" It cannot be denied that there is much force in the doctrine which requires a party to be vigilant before taking bad money. That, after all, is the only rule likely to prevent its circulation. A person who takes it without dispute and examines it afterward, if he is able to remember from whom he took it, and is allowed to recover back the amount, may save himself, but will usually subject an equally innocent party to loss. And it is also manifest that if he is ready to testify positively from whom he received it, his adversary cannot generally be as certain whether or no he paid it out, and cannot by his own oath alone, even if he is certain, convict a false witness of perjury. It will never do, in laying down rules, to overlook the consequences. If the rule of liability is to be enforced, it cannot be justly enforced without requiring a degree of vigilance conforming to the occasion. If payment in what is supposed to be legal tender paper is to be regarded as contingent and not absolute, the receiver should be regarded as having elected to retain it unless he uses speedy and active diligence, to determine its character, and to notify the giver that he may protect himself against prior parties. In *Camidge* v. *Allenby*, 6 B. & C. 373, a party who kept broken bank-bills seven days without action was held estopped. In *Jennison* v.

*Parker,* 7 Mich. 355, this rule of diligence was applied where a debtor had endorsed a note as collateral security, and it was not protested as against him. In *Phœnix Ins. Co.* v. *Allen,* 11 Mich. 501, and *Phœnix Ins. Co.* v. *Gray,* 13 Mich. 191, it was held, a party receiving sight paper was bound to forward it without any delay beyond what was necessary in the ordinary course of business, or compelled by circumstances. The rule gathered from the cases by Mr. Edwards is that in regard to forged paper also, there must be no 'unnecessary delay.' Edwards Bills, 207, 551. It is entirely safe to say that a person taking such paper, should not without some adequate excuse retain such paper without action, beyond such time as would give him reasonable opportunity to inform himself without inconvenience, or a neglect of other business to attend to it. The necessity for promptness exists in all cases, and where it appears there has been any delay beyond what was reasonably adequate under the circumstances, to enable the party to inform himself, he should not recover. And there should be some care in the taking as well as afterward."

We have, after much reflection, reached the conclusion that the doctrine laid down in the foregoing authorities is sound law, correct on principle, and will, in its practical application, strongly tend to prevent the circulation of counterfeit coin and currency. The doctrine is limited to cases where the parties acted in good faith, and will have no application where the person passing the money knew or had reason to know that it was counterfeit; for in such case such person would be liable both criminally and civilly, without regard to the question of diligence on the part of the person receiving the same.

The judgment is reversed, with costs, and the cause remanded, for a new trial, in accordance with this opinion.